# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE SOUTH AFRICAN APARTHEID LITIGATION | MDL No. 1499 (SAS)<br>ECF Case |
| THIS DOCUMENT RELATES TO: | |
| LUNGISILE NTSEBEZA, *ET AL.*,<br><br>PLAINTIFFS,<br>V.<br><br>DAIMLER AG, *ET AL.*,<br><br>DEFENDANTS. | 02 Civ. 4712 (SAS)<br>02 Civ. 6218 (SAS)<br>03 Civ. 1024 (SAS) |
| SAKWE BALINTULO, *ET AL.*,<br><br>PLAINTIFFS,<br>V.<br><br>DAIMLER AG, *ET AL.*,<br><br>DEFENDANTS. | 03 Civ. 4524 (SAS) |

# DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR LEAVE TO AMEND THEIR COMPLAINTS

## TABLE OF CONTENTS

Page

INTRODUCTION ......................................................................................... 1

ARGUMENT ................................................................................................ 2

I.    PLAINTIFFS FAILED TO ATTACH A PROPOSED AMENDED
      COMPLAINT TO THEIR MOTION .................................................... 2

II.   THE PROPOSED AMENDMENT SHOULD BE DENIED AS FUTILE ........... 3

      A.    Territoriality And *Mens Rea* Standards Governing The
            Proposed Amendment ........................................................... 4

            1.    A Defendant's U.S. Citizenship Does Not Suffice
                  To Establish A U.S. Connection To ATS Claims
                  Arising From Foreign Conduct  ...................................... 4

            2.    A Defendant's Alleged Vicarious Liability For
                  The Acts Of Its Foreign Subsidiaries Does Not
                  Establish A U.S. Connection To ATS Claims Arising
                  From Foreign Conduct .................................................. 4

            3.    To State A Claim For Aiding And Abetting A Foreign
                  Law-Of-Nations Violation, Plaintiffs Must Allege That
                  Defendants Themselves Committed Acts In The United
                  States For The Specific Purpose Of Facilitating The
                  Foreign Crime .............................................................. 5

      B.    Amendment Would Be Futile As To Ford ................................. 6

            1.    Plaintiffs' Allegations Of Ford's Purported "Control"
                  Over Ford South Africa Do Not Establish The Requisite
                  U.S. Connection To Law-Of-Nations Violations In South
                  Africa, As The Second Circuit Has Expressly Held ..................... 6

            2.    Plaintiffs' Allegations Concerning Ford's Lawful Efforts
                  To "Circumvent" U.S. Sanctions Do Not Establish
                  The Requisite U.S. Connection To Law-Of-Nations
                  Violations In South Africa, As The Second Circuit
                  Has Expressly Held .......................................................... 8

            3.    The Two Acts That Allegedly Aided And Abetted South
                  Africa's Law-Of-Nations Violations Lack A Sufficient U.S.
                  Connection, As The Second Circuit Expressly Held ..................... 9

            4.    Plaintiffs Also Fail To Allege Facts Establishing That Ford

i

**TABLE OF CONTENTS**
**(continued)**

Intended To Aid And Abet Acts Of Torture, Murder, And
Other Apartheid Atrocities............................................................ 10

C.    Amendment Would Be Futile As To IBM................................................ 12

    1.    Plaintiffs' Allegations Of IBM's Purported "Control"
Over IBM-SA Do Not Establish The Requisite U.S.
Connection To Law-Of-Nations Violations In South
Africa, As The Second Circuit Has Expressly Held .................... 12

    2.    Plaintiffs' Allegations Concerning Lawful Efforts to
"Circumvent" U.S. Sanctions Do Not Establish The
Requisite U.S. Connection To Law-Of-Nations Violations
In South Africa, As The Second Circuit Has Expressly Held ...... 14

    3.    The Acts That Allegedly Aided And Abetted South Africa's
Law-Of-Nations Violations of Apartheid and Denationalization
Lack A Sufficient U.S. Connection, As The Second Circuit
Expressly Held ........................................................................... 14

    4.    Plaintiffs Fail To Allege Facts Establishing That IBM
Intended to Aid And Abet Acts Of Denationalization
and Apartheid............................................................................. 16

CONCLUSION......................................................................................................... 19

# TABLE OF AUTHORITIES

**Page(s)**

C ASES

*Abercrombie v. Andrew Coll.*,
   438 F. Supp. 2d 243 (S.D.N.Y. 2006)............................................................ 2

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ..................................................................................... 11

*Balintulo v. Daimler AG*,
   727 F.3d 174 (2d Cir. 2013)................................................................. passim

*Burch v. Pioneer Credit Recovery, Inc.*,
   551 F.3d 122 (2d Cir. 2008)............................................................................ 3

*Chowdhury v. Worldtel Bangladesh Holding, Ltd.*,
   746 F.2d 42 (2d Cir. 2014).......................................................................... 15

*Foman v. Davis*,
   371 U.S. 178 (1962)........................................................................................ 3

*Go v. Rockefeller Univ.*,
   2008 WL 619039 (S.D.N.Y. Mar. 6, 2008) ................................................... 3

*Gurvey v. Cowan, Liebowitz & Latman, P.C.*,
   2013 WL 37180716 (S.D.N.Y. July 15, 2013) ............................................. 2

*In re S. African Apartheid Litig.*,
   617 F. Supp. 2d 228 (S.D.N.Y. 2009)................................................... passim

*Kiobel v. Royal Dutch Petroleum Co.*,
   133 S. Ct. 1659 (2013)............................................................................ 4, 5, 8

*Kiobel v. Royal Dutch Petroleum*,
   621 F.3d 111 (2d Cir. 2011)................................................................... 10, 16

*McGee v. Dunn*,
   940 F. Supp. 2d 93 (S.D.N.Y. 2013).............................................................. 2

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
   681 F.3d 114 (2d Cir. 2012)............................................................................ 3

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*,
   582 F.3d 244 (2d Cir. 2009)................................................................ 5, 11, 12, 17

*Zito v. Leasecomm Corp.*,
   2004 WL 2211650 (S.D.N.Y. Sept. 30, 2004).............................................. 3

### INTRODUCTION

Plaintiffs have moved for leave to file amended complaints, purportedly to add new allegations establishing that their claims under the Alien Tort Statute ("ATS") arise from U.S.-based conduct committed by the defendants—Ford Motor Company ("Ford") and International Business Machines Corporation ("IBM")—for the purpose of facilitating the human rights abuses of the government of apartheid South Africa. Their motion should be denied for multiple reasons.

To start, the motion does not include proposed amended complaints. Courts have denied motions to amend on that basis alone. Nor does plaintiffs' motion itself actually describe any *new* material allegations. Instead, the motion merely restates essentially the same allegations already made in the existing complaints—the same allegations that the Second Circuit has already declared cannot survive a motion to dismiss.

The allegations are inadequate to satisfy both the territoriality and *mens rea* requirements applicable to claims under the ATS. As to territoriality, plaintiffs merely describe facts relating to defendants' general control over their subsidiaries' operations in South Africa. Those facts relate only to defendants' potential *vicarious liability*, and the Second Circuit has made clear that a U.S. defendant's vicarious liability for the foreign conduct of a foreign subsidiary is not enough to establish a U.S. territorial connection to the foreign conduct: the ATS requires *conduct in the United States* giving rise to an international-law violation. Plaintiffs do not and cannot describe any U.S.-based conduct that violated international law—the alleged extrajudicial killings, torture, denationalization, and other inhumane acts of South African apartheid recounted in the complaints all happened in South Africa. And plaintiffs describe no facts indicating that

either defendant did anything on U.S. soil (or elsewhere, for that matter) to direct or compel the commission of such conduct.

Plaintiffs instead allege only that defendants' foreign subsidiaries—over which defendants allegedly exercised control—acted to *aid and abet* South African law-of-nations violations.  In addition to the lack of a territorial connection to the foreign subsidiaries' foreign acts, plaintiffs do not describe any new facts establishing the specific-intent *mens rea* required to state an aiding-and-abetting claim under the ATS.  That failure is not surprising—the defendants did not intentionally aid the crimes of the apartheid regime.  Indeed, the facts plaintiffs describe are the same facts they already plead, and those facts come nowhere close to showing that the business transactions at issue—which, as plaintiffs concede, complied with U.S. sanctions law—were actually *intended* by defendants to facilitate the slaughter, torture, or denationalization of black South Africans.  Plaintiffs' proposed amendment thus fails to cure the *mens rea* deficiencies in their existing complaints.

## ARGUMENT

## I.   PLAINTIFFS FAILED TO ATTACH A PROPOSED AMENDED COMPLAINT TO THEIR MOTION

The established rule in this Court is that "in making a motion for leave to amend, plaintiffs must attach a proposed amended complaint so that the Court and the opposing party has an opportunity to understand the exact changes proposed."  *Abercrombie v. Andrew Coll.*, 438 F. Supp. 2d 243, 275 (S.D.N.Y. 2006).[1]  Plaintiffs failed to comply with

---

[1] *See, e.g., Gurvey v. Cowan, Liebowitz & Latman, P.C.*, 2013 WL 3718071, at *6 (S.D.N.Y. July 15, 2013) ("Thus, if I were to construe plaintiff's reply as a motion for leave to serve a sixth amended complaint, it would be defective because it did not include the proposed amended pleading."); *McGee v. Dunn*, 940 F. Supp. 2d 93, 109-10 (S.D.N.Y. 2013) ("To obtain leave of court to amend the complaint, a party should file both a Rule 15

that obligation, likely in an attempt to mask the deficiencies of their claims.  If plaintiffs had complied with their obligations to include proposed amended complaints, the complaints could have been redlined against their existing complaints, more clearly exposing the lack of any new material facts supporting the territoriality and *mens rea* requirements applicable to their claims.  The motion accordingly should be denied.

## II.    THE PROPOSED AMENDMENT SHOULD BE DENIED AS FUTILE

"Futility is a determination, as a matter of law, that proposed amendments would fail to cure prior deficiencies or to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure."  *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 119 (2d Cir. 2012).  "[M]otions to amend should generally be denied in instances of futility." *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 126 (2d Cir. 2008); *see Foman v. Davis*, 371 U.S. 178, 182 (1962).

Based on the allegations plaintiffs describe, the amendment they propose would be futile.  Nothing they propose to "add" differs materially in any way from what they have *already alleged* in their operative complaints.  The Second Circuit has held those complaints to be legally deficient, *see Balintulo v. Daimler AG*, 727 F.3d 174, 194 (2d Cir. 2013), and the facts plaintiffs propose to add are not sufficient to satisfy either (let alone both) the territoriality or *mens rea* requirements applicable to their ATS claims.

---

motion and a proposed amendment or new pleading." (internal quotation omitted)); *Go v. Rockefeller Univ.*, 2008 WL 619039, at *4 (S.D.N.Y. Mar. 6, 2008) ("Plaintiff's Motion to Amend can be quickly dispatched because she has failed to attach a copy of the proposed amended complaint to her motion papers."); *Zito v. Leasecomm Corp.*, 2004 WL 2211650, at *25 (S.D.N.Y. Sept. 30, 2004) ("In order to meet the requirements of particularity in a motion to amend, a complete copy of the proposed amended complaint must accompany the motion so that both the Court and opposing parties can understand the exact changes sought." (quotation omitted)).

### A.   Territoriality And *Mens Rea* Standards Governing The Proposed Amendment

1.   *A Defendant's U.S. Citizenship Does Not Suffice To Establish A U.S. Connection To ATS Claims Arising From Foreign Conduct*

Plaintiffs' threshold contention is that an ATS claim arising from foreign conduct has a sufficient U.S. connection under *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013) ("*Kiobel II*"), merely so long as the defendant is a U.S. corporate citizen.  Mot. 3-4.  Plaintiffs are wrong—the Second Circuit in *Balintulo* already explicitly rejected their argument that the ATS "reaches extraterritorial conduct when the defendant is an American national."  727 F.3d at 189; *see id.* at 190 (emphasizing that defendants' U.S. citizenship was an "irrelevant factual distinction[]" from *Kiobel II*); *id.* at 194 ("[P]laintiffs' arguments that the Supreme Court's decision in *Kiobel* does not apply where the defendants are American citizens … are without merit.").  The "extraterritoriality analysis" under *Kiobel II* "asks where the violation of the law of nations occurred," not where the defendant resides.  *Id.* at 192 n.28 (alterations and quotation omitted).

2.   *A Defendant's Alleged Vicarious Liability For The Acts Of Its Foreign Subsidiaries Does Not Establish A U.S. Connection To ATS Claims Arising From Foreign Conduct*

Under the Supreme Court's opinion in *Kiobel II*, a plaintiff asserting an ATS claim must allege "relevant conduct within the United States giving rise to a violation of customary international law."  *Balintulo*, 727 F.3d at 192 (emphasis added).  Under that standard, it is not enough that a U.S. defendant may be vicariously liable for the foreign conduct of a foreign subsidiary—the plaintiff must identify the specific conduct in the United States that gave rise to the foreign international-law crime.  The Second Circuit made precisely that point in this case, rejecting plaintiffs' earlier effort—identical to their

current effort—to rely on defendants' vicarious liability to establish a U.S. connection to the wholly foreign conduct from which their claims arise:

> The complaint alleges only vicarious liability of the defendant corporations based on the actions taken within South Africa by their South African subsidiaries. … Because the defendants' putative agents did not commit any relevant conduct within the United States giving rise to a violation of customary international law—that is, because the asserted 'violation[s] of the law of nations occurr[ed] outside the United States,' *Kiobel*, 133 S. Ct. at 1669—the defendants cannot be vicariously liable for that conduct under the ATS.

*Id.* (emphasis omitted; second and third alterations in original).[2]  What plaintiffs must allege is U.S.-based conduct, committed by the defendant itself, for the purpose of facilitating law-of-nations violations in South Africa.  Plaintiffs have not and cannot do so, as explained in detail below.

    3.     *To State A Claim For Aiding And Abetting A Foreign Law-Of-Nations Violation, Plaintiffs Must Allege That Defendants Themselves Committed Acts In The United States For The Specific Purpose Of Facilitating The Foreign Crime*

To state a claim for aiding-and-abetting liability under the ATS, it is not enough to allege facts showing that the defendant "*knowingly* (but not purposefully) aid[ed] and abet[ted] a violation of international law."  *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 259 (2d Cir. 2009) (emphasis in original).  Rather, the plaintiff must allege facts establishing that the defendant acted for the "purpose of facilitating the commission of th[e] crime."  *Id.* (quotation omitted).  Combining that *mens rea* rule with the territoriality rule discussed above, a straightforward pleading requirement emerges for a plaintiff who seeks to hold a U.S.-based defendant liable for aiding and abetting foreign

---

[2] The *Balintulo* Court expressly left open whether vicarious liability theories *in general* are available in ATS cases, 727 F.3d at 192 n.28—the Court's point was that even if such theories generally are allowed, plaintiffs' theory *in this case* fails because it is based on primary conduct that occurred in a foreign country.

law-of-nations violations:  the plaintiff must identify conduct committed by the defendant in the United States done for the specific purpose of facilitating the foreign crime.

As shown in the sections that follow, plaintiffs do not propose to allege any such facts as to either defendant.

**B.     Amendment Would Be Futile As To Ford**

The allegations plaintiffs describe against Ford do not differ from what they allege in their existing complaints—allegations the Second Circuit has already held to be insufficient to satisfy the territoriality requirements of *Kiobel II*.  An "amendment" to "add" allegations that are neither new nor adequate is the very definition of a futile amendment.

1.       *Plaintiffs' Allegations Of Ford's Purported "Control" Over Ford South Africa Do Not Establish The Requisite U.S. Connection To Law-Of-Nations Violations In South Africa, As The Second Circuit Has Expressly Held*

The bulk of plaintiffs' motion discusses proposed allegations relating to the "control" Ford allegedly exercised over the operations of its subsidiary Ford South Africa ("FSA") in South Africa.  Those allegations are neither relevant nor new.

First, plaintiffs' control-related allegations do not even purport to show that Ford *itself* committed acts *in the United States* for the purpose of facilitating crimes in South Africa, *viz.*, torture, extrajudicial killing, and other inhumane acts associated with apartheid.  *See In re S. African Apartheid Litig.*, 617 F. Supp. 2d 228, 264-65 (S.D.N.Y. 2009).  Ford's control over FSA instead is at most relevant to establishing Ford's vicarious liability for the acts of FSA in South Africa under a theory of agency, i.e., that "the parent has the right to exercise control over the subsidiary with respect to matters entrusted to the subsidiary."  *Id.* at 272 (quotation omitted).  As shown above, a U.S. defendant's vicarious

liability for conduct that occurred entirely abroad is insufficient to establish a U.S.

connection to that conduct for purposes of ATS liability.

Second, plaintiffs' "new" allegations concerning control are nothing new at

all—the general facts of Ford's alleged "control" over FSA are not only alleged in the

existing complaints, but also were specifically cited by this Court in its earlier opinion

addressing vicarious liability:

- "From 1933 until 1985, Ford Motor Company of South Africa (Pty) Ltd. was allegedly a wholly-owned subsidiary of Ford Motor Company of Canada, itself a 76% owned subsidiary of Ford." *In re S. African Apartheid Litig.*, 617 F. Supp. 2d at 274 (citing Ntsebeza Compl. ¶ 101); *see* Mot. 18.

- "In 1985, Ford South Africa underwent a merger resulting in the creation of South African Motor Corporation (SAMCOR), which was 42% owned by Ford but allegedly continued to produce Ford-branded products using Ford parts and relying on Ford managers and engineers." *In re S. African Apartheid Litig.*, 617 F. Supp. 2d at 274-45 (citing Ntsebeza Compl. ¶¶ 103, 128); *see* Mot. 18-19.

- "In 1987, Ford allegedly fully divested its ownership share in SAMCOR but neither repatriated the proceeds nor ceased its managerial relationship with the company." *In re S. African Apartheid Litig.*, 617 F. Supp. 2d at 275; Mot. 19, 25.

- "Ford South Africa allegedly relied on American management." *In re S. African Apartheid Litig.*, 617 F. Supp. 2d at 274 (citing Ntsebeza Compl. ¶ 102); *see* Mot. 18, 20-22.

- Ford South Africa "used parts shipped from Ford Canada and Ford England, in order to sell Ford vehicles without running afoul of U.S. trade restrictions." *In re S. African Apartheid Litig.*, 617 F. Supp. 2d at 274 (citing Ntsebeza Compl. ¶¶ 101); *see* Mot. 20-21, 23-24; *see also* Balintulo Compl. ¶¶ 246-50.

Plaintiffs' motion adds a few other discrete facts of Ford's alleged control over

FSA, such as the allegation that Ford possessed a letter sent from FSA praising plaintiff

Thozamile Botha. Mot. 22-23. And plaintiffs' motion sometimes adds more color to facts

of control already alleged in the existing complaint. But more color and rhetoric about

Ford's control over FSA's foreign conduct does not change the basic nature of the claim,

which is addressed solely to *control*, and thus to Ford's vicarious liability for FSA's acts. What is missing from plaintiffs' motion is the same thing missing from their existing complaints:  allegations of purposeful "conduct within the United States giving rise to a violation of customary international law," *Balintulo*, 727 F.3d at 192, i.e., acts committed by Ford in the United States for the specific, conscious purpose of enabling the government of South Africa to commit torture, murder, and other atrocities against black South Africans.  To repeat the *Balintulo* Court's point:  allegations of "vicarious liability of the defendant corporations based on the actions taken within South Africa by their South African subsidiaries" are irrelevant, because defendants' "putative agents"—i.e., the South African subsidiaries—"did not commit any relevant conduct within the United States giving rise to a violation of customary international law."  *Id.*

2.   *Plaintiffs' Allegations Concerning Ford's Lawful Efforts To "Circumvent" U.S. Sanctions Do Not Establish The Requisite U.S. Connection To Law-Of-Nations Violations In South Africa, As The Second Circuit Has Expressly Held*

The Second Circuit also has expressly rejected plaintiffs' contention that a U.S. connection to the South African government's crimes is established by Ford's alleged attempts to circumvent U.S. sanctions policy by supplying—lawfully, plaintiffs concede—FSA plants with parts from abroad.  Plaintiffs alleged exactly the same facts (albeit in less detail) in the existing complaints—*e.g.*, Balintulo Compl. ¶¶ 246-50, Ntsebeza Compl. ¶ 128; *In re S. African Apartheid Litig.*, 617 F. Supp. 2d at 274—and they argued to the Second Circuit that those specific allegations satisfy *Kiobel II*'s territoriality requirements.  Responding to plaintiffs' allegations that defendants "took affirmative steps in this country to circumvent the sanctions regime," the Second Circuit held that they fail to establish a U.S. connection to the specific international-law crimes committed by the

government of South Africa.  *See* 727 F.3d at 192 (allegations about circumventing sanctions regime do not "tie[] the relevant human rights violations to actions taken within the United States").  Realleging the same facts cannot yield a different result.

3.     *The Two Acts That Allegedly Aided And Abetted South Africa's Law-Of-Nations Violations Lack A Sufficient U.S. Connection, As The Second Circuit Expressly Held*

Beyond its irrelevant and retread "control" and "circumvention" allegations, plaintiffs' motion describes two specific acts that allegedly aided and abetted South Africa's international-law violations:  the sale of specialized vehicles to the military and police, and the sharing of information about anti-apartheid and union activists.  Mot. 24-25. Yet again, there is nothing materially new in those allegations.  This Court itself identified the same two allegations as the sole basis for plaintiffs' aiding-and-abetting theory in denying defendants' motion to dismiss the complaints years ago.  *In re S. African Apartheid Litig.*, 617 F. Supp. 2d at 264.  Indeed, the only support plaintiffs cite for their "new" information-sharing allegations is the *existing Ntsebeza* complaint.  Mot. 25 nn. 80-82.  And while plaintiffs do add more detail about the alleged vehicle sales, those details only confirm the inadequacy of their allegations.  This Court held that their allegations concerning specialized-vehicle sales satisfy the ATS's *actus reus* requirement because the vehicles were alleged to have been "specifically designed to kill, to inflict pain, or to cause other injuries resulting from violations of customary international law."  *In re S. African Apartheid Litig.*, 617 F. Supp. 2d at 258.  Yet plaintiffs now explain that what was "specialized" about these vehicles was that they had engines "more powerful than in other cars," and some had "three Weber model double carburetors, as opposed to [normal models] that had only one double carburetor," Mot. 24—allegations that do not plausibly show that the vehicles FSA sold to the military and police were "specifically designed" for

extrajudicial killing.  In any event, plaintiffs certainly allege nothing different about *where* the manufacture and sale of the purportedly specialized vehicles occurred.  And again, the Second Circuit in *Balintulo* explicitly addressed both the information-sharing and vehicle sales, and held that they fail to establish a U.S. connection because they were committed in South Africa by FSA, not in the United States by Ford itself.  727 F. 3d at 192.[3]  It obviously would be futile to file an "amended" motion that merely restates the same inadequate allegations.

> 4.   *Plaintiffs Also Fail To Allege Facts Establishing That Ford Intended To Aid And Abet Acts Of Torture, Murder, And Other Apartheid Atrocities*

Plaintiffs' information-sharing and vehicle-sale allegations also lack any facts establishing that Ford engaged in such acts for the specific *purpose* of facilitating the international-law crimes of torture, extrajudicial killing, and other atrocities associated with apartheid.  Plaintiffs must identify "specific facts" showing that defendants intended to bring about such crimes.  *Kiobel v. Royal Dutch Petroleum*, 621 F.3d 111, 188 (2d Cir. 2011) (Leval, J., concurring in judgment).  But plaintiffs at most describe facts supporting an inference that Ford had *knowledge* that its vehicles and information might be used by the apartheid government to commit human-rights abuses.  Nowhere do plaintiffs allege specific facts showing that Ford *wanted* the South African government to commit such crimes, or—more to the point—that Ford provided vehicles and information for the specific purpose of facilitating the torture and slaughter of black South Africans.

---

[3] That result is controlling, but also unassailable.  The only party that could have "cooperat[ed] with security forces" when those forces "regularly visited and entered" FSA plants (Mot. 25) was FSA, not Ford itself.  In fact, the *Ntsebeza* complaint plaintiffs cite as the basis for the allegation asserts these facts only as to FSA.  *Balintulo*, 727 F.3d at 182. And the manufacture and sale of specialized vehicles occurred outside the United States, as plaintiffs themselves emphasize in their "circumvention" theory.  Mot. 24 (Ford allegedly sought to circumvent U.S. trade regulations "by using its facilities outside the United States to send parts to South Africa" (emphasis added)).

Indeed, plaintiffs' own motion establishes essentially the opposite purpose. According to plaintiffs, Ford was principally interested in maintaining a business presence in the country so as "to await the development of the black market and not be excluded from its enormous potential." Mot. 20 (quotation omitted). Ford was "specifically concerned," plaintiffs explain, "about not losing control [of FSA operations] to South African nationals." *Id.* Ford concededly adopted the Sullivan Principles of non-discrimination in its South African operations (Mot. 21), and Ford complied at all times with U.S. law regulating trade with South Africa (Mot. 21, 23-24).

To the extent plaintiffs' allegations leave any ambiguity about Ford's intentions, that ambiguity itself defeats their aiding-and-abetting claims. Unlike (for example) Zyklon B gas, *see In re S. African Apartheid Litig.*, 617 F. Supp. 2d at 258, specialized police and military vehicles—i.e., vehicles with larger engines and more carburetors than normal vehicles, Mot. 24—obviously have many legitimate uses unrelated to extrajudicial killing, so the mere fact that FSA allegedly sold these vehicles does not itself establish that FSA intended them for use in international-law crimes against black South Africans. That conclusion follows directly from *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), which holds that a complaint's allegations must establish more than "the mere *possibility* of misconduct," *id.* at 679 (emphasis added). More important, it also follows from *Talisman*, which establishes a critical distinction between a defendant's "knowledge" that its act might support a human-rights crime, and the defendant's "purpose" to facilitate such crimes. *See Talisman*, 582 F.3d at 259 ("Thus, applying international law, we hold that the *mens rea* standard for aiding and abetting liability in ATS actions is purpose *rather than* knowledge alone." (emphasis added)). Indeed, the *Talisman* Court itself believed it significant that

11

none of the alleged conduct in that case "was inherently criminal or wrongful." *Id.* at 261. If the allegation of facts showing at most that Ford *knowingly* aided and abetted the South Africa government's law-of-nations violations permits an inference that Ford *purposefully* did so, then *Talisman* is meaningless.

### C.   Amendment Would Be Futile As To IBM

Plaintiffs claim that IBM aided and abetted the international law violations of apartheid and denationalization principally by assisting in the creation of identity documents for the Bophuthatswana homeland and the South African government.  Mot. 13-17.  These proposed allegations are essentially the same as those in plaintiffs' existing complaints.  (*See* Ntsebeza Compl. ¶¶ 134-137; Balintulo Corr. Sec. Am. Compl. ¶¶ 207-09.)  Plaintiffs' existing detailed complaints do not allege that IBM took actions in the United States to assist the South African government to create the identity documents, and plaintiffs' current motion does not propose to add any new allegations of such conduct. Instead, plaintiffs merely propose adding allegations regarding IBM's conduct in the United States that are completely unrelated to plaintiffs' claims that IBM aided and abetted the law-of-nations violations of apartheid and denationalization.  *See*, *e.g.*, Mot. 6 ("IBM headquarters provided personnel policies for employees throughout the company, including in South Africa"); *id.* 9 ("IBM opposed the 1978 sanctions"); *id.* 10 (IBM misled its shareholders about its activities in South Africa).

Because plaintiffs fail to allege any U.S. conduct by IBM for the purpose of facilitating denationalization or apartheid, amendment would be futile as to IBM.

1.   *Plaintiffs' Allegations Of IBM's Purported "Control" Over IBM-SA Do Not Establish The Requisite U.S. Connection To Law-Of-Nations Violations In South Africa, As The Second Circuit Has Expressly Held*

Plaintiffs devote significant parts of their motion to discussing allegations relating

to the "control" IBM allegedly exercised over its subsidiary IBM South Africa

("IBM-SA").  Plaintiffs' allegations of corporate control fall into three main categories:

- Plaintiffs allege standard corporate conduct by IBM that would apply to most companies headquartered in the United States with subsidiaries in other countries.  *See* Mot. 6 ("[IBM]'s Board of Directors, which meets in the United States, is responsible for supervising the company's overall affairs"); *id.* ("At all relevant times, the code of business conduct, standards, and values for IBM directors, executive officers, and employees globally were set by IBM in the United States."); *id.* ("IBM headquarters provided personnel policies for employees throughout the company, including in South Africa").

- Plaintiffs allege that IBM exported its hardware, software and expertise from the United States to South Africa.  (Mot. 7-8; *id.* 6 ("IBM did not have research and development or manufacturing facilities in South Africa").)

- Plaintiffs allege that even though IBM withdrew from South Africa in 1987 and had no "assets, capital, or employees in South Africa," IBM continued to license and distribute its products in the country through its former subsidiary. (Mot. 17.)

Plaintiffs have never asserted, and do not now assert, that these allegations purport

to show that IBM itself committed conduct in the United States for the purpose of

facilitating denationalization or apartheid in South Africa.  Rather, these allegations

appear, at most, to be relevant to whether an agency relationship existed between IBM and

IBM-SA.  Indeed, plaintiffs' allegations concerning IBM's control are essentially the same

ones asserted previously and cited by the Court in its earlier opinion addressing vicarious

liability.  *See In re S. African Apartheid Litig.*, 617 F. Supp. 2d at 275 ("IBM allegedly

supplied products, parts, and expertise to the subsidiary, which then merely distributed

these goods to South African customers" (citing Ntsebeza Compl. ¶¶ 129-130, 140)); *id.*

("After IBM sold its subsidiary to a group of local employees in 1987, IBM South Africa

allegedly continued to serve as a mere conduit for IBM products and parts" (citing

Ntsebeza Compl. ¶ 141)).  Plaintiffs' agency allegations, however, are irrelevant because

IBM's "putative agent"—*i.e.*, IBM-SA— "did not commit any relevant conduct within the

United States giving rise to a violation of customary international law," as the Second Circuit has already held. *Balintulo*, 727 F.3d at 192.

2.   *Plaintiffs' Allegations Concerning Lawful Efforts to "Circumvent" U.S. Sanctions Do Not Establish The Requisite U.S. Connection To Law-Of-Nations Violations In South Africa, As The Second Circuit Has Expressly Held*

Plaintiffs' proposed allegations concerning IBM's conduct with respect to the sanctions imposed on South Africa also fail to support a plausible inference that IBM's actions in the United States aided and abetted law-of-nations violations. Specifically, plaintiffs allege that IBM opposed U.S. sanctions against South Africa and that when sanctions were enacted in the United States, IBM tried to circumvent the "sanctions regime." Mot. 8-9. That is insufficient. None of these allegations are tied to the specific ATS claims plaintiffs have leveled against IBM. Indeed, the Second Circuit has already ruled that none of plaintiffs' existing allegations that IBM and other defendants "continued to supply the South African government with their products, notwithstanding various legal restrictions against trade with South Africa," "ties the relevant human rights violations to actions taken within the United States." *Balintulo*, 727 F.3d. at 192.[4]

3.   *The Acts That Allegedly Aided And Abetted South Africa's Law-Of-Nations Violations of Apartheid and Denationalization Lack A Sufficient U.S. Connection, As The Second Circuit Expressly Held*

Plaintiffs allege that IBM aided and abetted apartheid and denationalization principally by assisting in the creation of identity documents for the Bophuthatswana homeland and the "Book of Life" population registry for the South African government. Mot. 13-17. The Court previously identified these same allegations as the basis for

---

[4] Plaintiffs further allege that IBM misled its own shareholders about its actions in South Africa. Mot. 10-11. But that allegation plainly lacks the required connection to the "relevant human rights violation" of denationalization or apartheid. *Balintulo*, 727 F.3d. at 192.

plaintiff's aiding-and-abetting theory in denying defendants' motion to dismiss the complaints. *In re S. African Apartheid Litig.*, 617 F. Supp. 2d at 265, 268.

Plaintiffs fail to allege that IBM's assistance in creating the Bophuthatswana identity documents or the Book of Life was undertaken in the United States. All of the IBM conduct that plaintiffs point to as assisting in the creation of the Bophuthatswana identity documents took place in South Africa. Mot. 14-15 (selling IBM equipment to the Bophuthatswana government); *id.* 15 (training Bophuthatswana government employees in an IBM-specific programming language); *id.* (troubleshooting and repairing IBM equipment for the Bophuthatswana government); *id.* ("actively participating" in creating a new identity book for the Bophuthatswana government); *id.* (assisting Bophuthatswana government employees to write in-house code). Similarly, all of the IBM activity plaintiffs point to as assisting in the development of the Book of Life took place in South Africa. Mot. 16 (providing the hardware that served as the "memory bank" for South Africa's national identity system); *id.* (providing essential support for the Book of Life); *id.* (providing IBM mainframes to the South African government).

These allegations of conduct that took place in South Africa, but *not* in the United States, cannot overcome the presumption against extraterritoriality. Just as in *Kiobel II* and *Chowdhury,* all relevant conduct took place outside the United States. *See Kiobel II*, 113 S. Ct. at 1669 ("[A]ll the relevant conduct took place outside the United States"); *Chowdhury v. Worldtel Bangladesh Holding, Ltd.*, 746 F.2d 42, 49 (2d Cir. 2014) (no ATS jurisdiction because "all relevant conduct" occurred in Bangladesh). In addressing plaintiffs' existing complaints, the Second Circuit recognized that plaintiffs' allegations fail to establish a U.S. connection because they were committed in South Africa by IBM-SA, and not in the

United States by IBM itself. *Balintulo,* 727 F.3d at 192. Plaintiffs' filing of an amended complaint with the same inadequate allegations would be futile.

4. *Plaintiffs Fail To Allege Facts Establishing That IBM Intended to Aid And Abet Acts Of Denationalization and Apartheid*

Plaintiffs have made no non-conclusory allegation that IBM-SA assisted Bophuthatswana or the South African government with the purpose of facilitating apartheid and denationalization. Mot. 13-17. Plaintiffs must (but do not) identify "specific facts" showing that IBM intended to bring about such violations. *Kiobel*, 621 F.3d at 188 (2d Cir. 2011) (Leval, J., concurring in judgment). Plaintiffs at most describe facts supporting an inference that IBM had *knowledge* that the identity books and Book of Life might be used by the apartheid government for denationalization or apartheid. Nowhere do plaintiffs allege specific facts showing that IBM *wanted* the South African government to commit such violations, or that IBM provided any assistance for the specific purpose of facilitating denationalization or apartheid.

Plaintiffs do not allege that the creation of the identity books or the Book of Life by itself was wrongful, much less a violation of the law of nations. Instead, both the identity books and the Book of Life are alleged to contain population data. Mot. 15 ("The identity documents produced for the Bophuthatswana government contained the name, sex, racial classification, ethnic origin, and residential and/or postal address of the individual"); Mot. 16 ("The Book of Life contained assorted information, including racial classification, name, sex, date of birth, residence, photograph, marital status, driver license number, dates of travel/exit from and/or return to the country, place of work or study, and fingerprints" of "citizens the government classifies as 'coloureds,' Asians and whites."). That the identity documents and the Book of Life are not alleged to be wrongful in and of themselves weighs

16

against a plausible inference that IBM acted with the purpose of advancing apartheid or denationalization.  *See Talisman*, 582 F.3d at 261 (when addressing the defendants' *mens rea*, the court considered that none of defendants' acts "was inherently criminal or wrongful").

Significantly, as plaintiffs concede, the Book of Life was a system that included data on white South Africans but *not* black South Africans.  IBM's alleged participation in creating the Book of Life therefore cannot provide any support for allegations that IBM intended that such participation would further acts of denationalization of black South Africans.

Even if the identity documents and Book of Life could be used only for illegitimate purposes, under *Talisman*, what matters is not whether a defendant has "knowledge" that its conduct would facilitate a human-rights crime but that it was defendant's "purpose" to facilitate such crimes.  *Talisman*, 582 F.3d at 259.  Plaintiffs completely fail to make any such factual allegations.

Plaintiffs also allege that IBM's opposition to sanctions against South Africa and attempts to circumvent the "sanctions regime" demonstrate IBM's intent to support apartheid or denationalization.  Mot. 5-6.  But neither IBM's alleged opposition to sanctions, nor an effort to circumvent sanctions, can create a plausible inference that IBM-SA assisted in the creation of the identify books and Book of Life with the purpose of facilitating apartheid and denationalization.  Such an inference is particularly implausible here, given the allegations that many other U.S. companies opposed sanctions against South Africa (Mot. 9 ("other multinationals registered their opposition to the ban and asked that it be lifted")) and plaintiffs' failure to allege that IBM actually violated the sanctions

(Mot. 13 ("Years of IBM's actions make evident that IBM pursued business in a manner directly contrary to the *intent* of the U.S. embargo and sanctions regime") (emphasis added); *id.* 11 (IBM justified certain transactions that plaintiffs find now objectionable by arguing that U.S. regulations did not restrict them); *id.* 11-12 n.33 (U.S. multinationals were using "a loophole to circumvent the goal" of the embargo).

Other proposed allegations regarding IBM's conduct in the United States actually contradict, rather than support, an inference that IBM had the *mens rea* of advancing denationalization or apartheid.  Plaintiffs allege that IBM Chairman Akers stated in 1985: "We are not in business to conduct moral activity, we are not in business to conduct socially responsible action.  We are in business to conduct business."  Mot. 10-11.  This statement supports an inference that IBM's purpose was to conduct business through the sale of its technology rather than for any other reason, including, specifically, to facilitate denationalization or apartheid.  Plaintiffs also allege that both IBM and IBM-SA had adopted, as of 1979, the Sullivan Principles.  Mot. 6, n.6.  The Sullivan Principles required signors to agree, *inter alia*, to "non-segregation of the races in all eating, comfort, and work facilities," and "improving the quality of life for blacks and other nonwhites outside the work environment in such areas as housing, transportation, school, recreation, and health facilities."[5]  IBM's early adoption of the Sullivan Principles is inconsistent with any allegation that IBM had the purpose of advancing international law violations by Bophuthatswana or the South African government (even if plaintiffs had made any such non-conclusory assertions).

In light of plaintiffs' failure to set forth non-conclusory allegations that IBM acted

---

[5] "Sullivan Principles," http://www.marshall.edu/revleonsullivan/indexf.htm (visited June 26, 2014).

with the purpose of advancing apartheid or denationalization, amendment would be futile as to IBM.

## CONCLUSION

For the foregoing reasons, the Court should deny the motion for leave to amend plaintiffs' complaints, and enter judgment for defendants.

June 27, 2014

Respectfully submitted,

/s/ Jonathan D. Hacker
Jonathan D. Hacker
Anton Metlitsky
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006
Telephone:  (202) 383-5300
Facsimile:  (202) 383-5414
Email:  jhacker@omm.com

*Attorneys for Ford Motor Company*

/s/ Keith R. Hummel
Keith R. Hummel
Teena-Ann Sankoorikal
James E. Canning
CRAVATH, SWAINE & MOORE LLP
825 Eighth Avenue
New York, New York 10019
Telephone:  (212) 474-1000
Facsimile:   (212) 474-3700
Email: khummel@cravath.com

*Attorneys for International Business Machines Corporation*